FILED

07/07/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0739

DA 25-0739

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2026 MT 144

GEORGE TUMA and IRENE TUMA,

      Plaintiffs and Appellants,

  v.

ADAM BRITT and AMBER BRITT,

      Defendants and Appellees.

APPEAL FROM:   District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DV-22-573(C)
Honorable Heidi J. Ulbricht, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

          Doug Scotti, Frampton Purdy Law Firm, Whitefish, Montana

      For Appellees:

          Angela M. LeDuc, Erin T. McGarvey, Rocky Mountain Law Partners,
P.C., Kalispell, Montana

                    Submitted on Briefs:  June 10, 2026

                              Decided:  July 7, 2026

Filed:

                      _____
                             Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1     George and Irene Tuma (the Tumas) appeal from the October 16, 2025 Order of the Eleventh Judicial District Court, Flathead County, granting partial summary judgment in favor of Adam and Amber Britt (the Britts).  The court concluded that the 2018 Assignment and Second Amendment of Lease (Second Lease Amendment) was ambiguous as to whether it removed all of Section 5 of the 1992 Lease Agreement and Option to Purchase (1992 Lease), and, after considering extrinsic evidence of the contracting parties' intent, held that the Britts retained a vested right to acquire an undivided tenancy-in-common interest in the Parent Tract, with exclusive use of the 10.325-acre leasehold.  The court ordered the Tumas to execute a quitclaim deed conveying a 27.5% tenancy-in-common interest to the Britts.  We affirm.

¶2     We restate the issues on appeal as follows:

1. *Whether the District Court correctly determined that the Second Lease Amendment is ambiguous.*

2. *Whether the District Court correctly considered extrinsic evidence of the contracting parties' intent to conclude that the Britts purchased an undivided tenancy-in-common interest in the Parent Tract.*

3. *Whether the District Court properly evaluated Don Hostak's testimony in concluding that the Britts retained the ability to acquire the tenancy-in-common interest.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     This dispute concerns a 38.2-acre tract of land on Three Eagle Lane in Bigfork, Flathead County, Montana, described as Government Lot 3 in Section 22, Township 27

2

North, Range 19 West, M.P.M.  The tract (Parent Tract) lies within a designated floodplain and, under Flathead County regulations, cannot be subdivided.

¶4　In September 1992, Leslie and Bernice Slater, as lessors, entered into a long-term land lease with Charles DeRego, as lessee, for a portion of the Parent Tract.  The 1992 Lease had an 89-year term and was expressly non-residential.  Section 5 of the Lease, titled "Option to Purchase," contained two paragraphs:

> 5. <u>Option to Purchase:</u> In consideration of the payments set forth above, Lessor grants to Lessee the option to purchase the premises described above, at any time during the 89 year term of this lease, so long as such purchase may be allowed under applicable subdivision and sanitation laws and other applicable laws.  The consideration for such purchase shall be complete payment of all rental payments required during the first twenty (20) years of this lease as set forth under the "Rent" provision above, together with an additional sum of ten dollars ($10.00).  During the first twenty (20) years of this lease Lessee may exercise such option to purchase only upon Lessor's written consent; thereafter, no such consent shall be required.  In addition to paying the full $72,000 rent as set forth above (together with any interest required above), in order to exercise such option, Lessee shall pay the additional sum of ten dollars and Lessee shall pay all out-of-pocket costs of effecting such purchase, including, but not limited to, survey fees, legal fees, engineering fees, recording costs, governmental permit fees, etc., required to accomplish the transfer of fee title to Lessee.
>
> In the event any time after the first twenty (20) year term of this lease that Lessee is not able to purchase fee title to the five (5) acres described above because of restrictions against such purchase by Montana or other relevant governmental body laws (including subdivision laws) then Lessee shall have the option to purchase an undivided percentage interest in tenancy in common in the smallest tract which may be subdivided along with the five (5) acres described above.  Such undivided percentage interest shall be according to the percentage which five (5) acres bears to the total size of the parcel conveyed in which such five (5) acre parcel sits. In addition to the tenancy in common interest, Lessee shall be entitled to exclusive use of the five (5) acre parcel described above, contained within the conveyed parcel.

3

¶5     The first paragraph thus granted an option to purchase the leased premises during the 89-year term, conditioned on subdivision and sanitation approval and full payment of the first twenty years of rent.  The second paragraph provided an alternative: if, after the first twenty years, subdivision remained unavailable due to governmental restrictions, the lessee could instead purchase an undivided tenancy-in-common interest in the smallest tract that could be subdivided with the leased acreage, with exclusive use of the leased parcel.

¶6     In 2006, the parties executed a First Amendment to the Lease, correcting the leased acreage to 6.325 acres, reiterating the 89-year term, and providing for automatic renewal for an additional 89-year term.  The First Amendment did not alter Section 5.

¶7     After the deaths of Leslie and Bernice Slater, ownership of the Parent Tract passed to the *Revocable Living Trust of Bernice R. Slater*, dated October 17, 2003, with Bernice's son-in-law, Don Hostak, serving as successor trustee.  By the time the Britts became involved, the Slater Trust—not the individual Slaters—held title to the Parent Tract and stood in the shoes of the original lessors under the 1992 Lease.  The Britts acquired their leasehold interest on April 3, 2018, when they purchased from Charles DeRego—the original lessee—both (1) his rights under the 1992 Lease and its 2006 First Amendment, and (2) the existing structure on the leased tract, which DeRego owned by separate warranty deed.  The structure—originally used as a church and later converted into a residence—sat on a permanent foundation and had been continuously occupied since the early 1990s.  The transfer of DeRego's leasehold interest to the Britts was formalized through the Second Lease Amendment, jointly negotiated between the Britts and Trustee

4

Hostak and drafted by attorney Brant Beaudry. The Amendment modified several provisions of the 1992 Lease, including the scope of the lessees' construction rights, the nature of their access easement, and the treatment of Section 5's purchase options.

¶8 The Second Lease Amendment amended several provisions of the 1992 Lease. The language at the center of this appeal appears in Section 5 of the Amendment: "Paragraph 5. 'Option to purchase' is hereby removed." The Amendment also granted the Britts broad rights to "build, construct or excavate on any improved or non-improved areas within [the leased tract] without approval from the Trust" and granted them a 30-foot access and utilities license that would convert to a permanent easement upon termination of the lease.

¶9 Critically, the Second Lease Amendment further stated: "In the event the parent tract is subdivided and to allow conveyance of title to the 6.325 acre tract, Assignees have paid in full for the tract and does [sic] not need to purchase the 6.325-acre tract. Additionally, the license for egress and ingress and utilities will convert to a permanent easement." The District Court later found this language consistent with the parties' understanding that the Britts had already paid full consideration for their interest in the leased acreage. The parties later expanded the leasehold to 10.325 acres, but the "paid in full" language remained central to the parties' understanding of the Britts' rights.

¶10 On November 6, 2020, the Britts and the Slater Trust executed a Third Amendment of Lease (Third Amendment), drafted again by attorney Brant Beaudry. The Third Amendment expanded the leasehold from 6.325 acres to 10.325 acres by adding a 4-acre strip extending to Three Eagle Lane and granted a 40-foot egress, ingress, and utilities easement. The Third Amendment recited that the Britts had paid additional consideration

for the added acreage. The District Court found that, by virtue of the Lease and its amendments, the Britts had "paid in full" for their interest in the 10.325-acre leasehold and the associated rights.

¶11 On October 12, 2020—shortly before the Third Amendment was executed—the Tumas entered into a Purchase and Sale Agreement with the Slater Trust to acquire the Parent Tract. The sale closed in December 2020, after the Third Amendment had been recorded.

¶12 Before closing, the Tumas received and reviewed a title commitment that expressly disclosed the Lease and its amendments, including the Third Amendment. The Purchase and Sale Agreement recommended that the purchasers have the title commitment and closing documents reviewed by independent counsel. The District Court found that the Tumas read the Lease and amendments before purchasing the property but chose not to obtain independent legal advice.

¶13 The Tumas assert that, based on their own reading, they concluded that the Britts held only a terminable leasehold interest and that the "option to purchase/tenancy-in-common provision in the original 1992 Lease had been terminated by mutual amendment[.]" They purchased the Parent Tract at what they describe as "full market price," believing it was encumbered only by a terminable lease and license, not by any vested ownership interest in favor of the Britts.

¶14 Relations between the parties deteriorated after the sale. The Tumas filed suit in May 2022, later amending their complaint to assert claims including breach of contract, conversion, negligence per se, declaratory judgment, injunction, unlawful detainer,

6

property damage, and breach of the implied covenant of good faith and fair dealing. Many of these claims challenged the Britts' use of the leasehold, tree removal, road work, and alleged regulatory violations.

¶15 The Britts answered and asserted counterclaims. Relevant here, their first counterclaim sought a declaratory judgment that: (1) the Britts held a 40-foot access easement; (2) the Tumas could not revoke or interfere with that easement; (3) the Tumas had no unilateral right of entry onto the leased property; (4) the Britts had not breached the Lease absent proper notice and opportunity to cure; and (5) the Britts' right to purchase a tenancy-in-common interest under Section 5 had vested and had been paid in full. Their second counterclaim sought supplemental relief under § 27-8-313, MCA, declaring that the Britts had acquired exclusive use of the 10.325 acres as tenants in common under Section 5, paragraph 2 of the 1992 Lease. Their third counterclaim, pled in the alternative, sought a constructive trust over the 10.325 acres to prevent unjust enrichment if the Tumas retained full title.

¶16 The Britts moved for partial summary judgment on their first and second counterclaims, arguing that: (1) the Second Lease Amendment did not remove the second paragraph of Section 5; (2) their tenancy-in-common option had vested; and (3) they had paid in full for that interest. They supported their motion with declarations from: Don and Myrna Hostak (successor trustee and daughter of the Slaters), Adam and Amber Britt, and Attorney Brant Beaudry, who drafted the Second and Third Amendments.

¶17 The Hostaks' Joint Declaration stated, among other things:

7

> This Second Amendment notes that "Paragraph 5. 'Option to Purchase' is hereby removed," referring to the original Britt Property Lease. To be clear, the second paragraph following "Paragraph 5. Option to Purchase" in the original Lease was not removed. That paragraph enables the Britts to obtain an "undivided tenancy in common interest" in the Parent Tract. Our understanding of a tenancy in common interest is that it's a joint ownership interest in the property with the other owners (formerly the Trust, now the Tumas).

They further declared that the leases were designed to give the tenants rights "equivalent to full ownership, with the ability to secure full title ownership should the tenant choose to pursue it," and that this was discussed with the Tumas.

¶18    Attorney Beaudry declared that the parties directed him to include language in the Second Lease Amendment reflecting that the Britts had "paid in full" for their property interest and that: "As part of that Second Amendment, we removed the paragraph beginning 'Option to Purchase' because more than twenty years had passed, and the paragraph no longer needed to be included."

¶19    The Tumas opposed the motion, arguing that the Second Lease Amendment unambiguously removed the entire Section 5, that the parol evidence rule barred consideration of extrinsic evidence, and that Don Hostak's later deposition testimony contradicted the Joint Declaration and created a genuine issue of material fact.

¶20    In April 2025, the Tumas deposed Don and Myrna Hostak. Don testified that he had not drafted the 1992 Lease, had not discussed its terms with DeRego or Bernice Slater, and that the original Lease "had nothing to do" with him. He did not recall why the "Option to Purchase" was removed in 2018 and did not recall whether any part of the option remained. Don also testified that he did not know what a "tenancy in common" was and

8

could not remember the details of the Joint Declaration, though he acknowledged his signature and that he would have understood it at the time he signed it. He nonetheless affirmed that, if subdivision laws changed, he believed the Britts should have some ownership claim to the property.

¶21 Myrna Hostak testified that she was as involved in the Trust as Don, that their intent was to preserve the Britts' right to acquire title regardless of whether the land could be subdivided, and that the Britts retained their right to acquire a tenancy-in-common interest. She confirmed that the Joint Declaration accurately reflected both her and Don's understanding at the time they signed it and that Don's memory had declined "a whole lot" since then.

**STANDARD OF REVIEW**

¶22 We review a district court's grant of summary judgment de novo, applying the criteria of M. R. Civ. P. 56. *BMK Enters. v. Bailey Enters. of Mont., LLC*, 2026 MT 102, ¶ 7, 428 Mont. 111, 589 P.3d 620. Summary judgment is appropriate when the pleadings, discovery, and affidavits show no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3).

¶23 The construction and interpretation of a contract, including whether it is ambiguous, is a question of law reviewed for correctness. *Mary J. Baker Revocable Tr. v. Cenex Harvest States, Coops., Inc.*, 2007 MT 159, ¶ 19, 338 Mont. 41, 164 P.3d 851; *BMK Enters.*, ¶ 7. If a contract is ambiguous, the court must determine the parties' intent as a question of fact, which may be resolved on summary judgment when the extrinsic evidence

9

is undisputed. *BMK Enters.*, ¶ 18; *AWIN Real Estate, LLC v. Whitehead Homes, Inc.*, 2020 MT 225, ¶ 13, 401 Mont. 218, 472 P.3d 165.

## DISCUSSION

¶24 Montana law requires that contracts be interpreted "to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Section 28-3-301, MCA; *Mary J. Baker Revocable Tr.*, ¶ 21. When a contract is reduced to writing, the parties' intention is to be ascertained from the writing alone, if possible. Section 28-3-303, MCA; *BMK Enters.*, ¶ 9.

¶25 If the language of a contract is clear and unambiguous—i.e., reasonably susceptible to only one construction—the court must apply the language as written. Section 28-3-401, MCA; *Richards v. JTL Grp., Inc.*, 2009 MT 173, ¶ 14, 350 Mont. 516, 212 P.3d 264; *Mary J. Baker Revocable Tr.*, ¶ 19. A mere disagreement between the parties over the meaning of a provision does not create ambiguity. *Mary J. Baker Revocable Tr.*, ¶ 20 (citations omitted).

¶26 A contract is ambiguous when its language is susceptible to at least two reasonable but conflicting meanings. *Mary J. Baker Revocable Tr.*, ¶ 20; *BMK Enters.*, ¶ 9. When ambiguity exists, the court must consider extrinsic or parol evidence to ascertain the parties' intent and determine the meaning of the writing. *BMK Enters.*, ¶¶ 9, 16, 18; *K&R P'ship v. City of Whitefish*, 2008 MT 228, ¶ 26, 344 Mont. 336, 189 P.3d 593.

¶27 The parol evidence rule, codified at §§ 28-2-904 and -905, MCA, provides that a written contract supersedes prior or contemporaneous oral negotiations and that, when the terms of an agreement have been reduced to writing, the writing is presumed to contain all

10

terms. Section 28-2-905(1), MCA. However, the rule "does not exclude other evidence of the circumstances under which the agreement was made or to which it relates[.]" Section 28-2-905(2), MCA; *Mary J. Baker Revocable Tr.*, ¶ 21. Where a written instrument is ambiguous, extrinsic evidence may be used to discover the parties' intent. *BMK Enters.*, ¶ 18; *Olson v. Jude*, 2003 MT 186, ¶ 47, 316 Mont. 438, 73 P.3d 809.

¶28 In construing ambiguous provisions, courts may consider the circumstances under which the contract was made, the subject matter, and the parties' course of performance. Section 28-3-402, MCA; *Mary J. Baker Revocable Tr.*, ¶ 21. When a provision is equally susceptible to two constructions, the court must apply the construction most favorable to the party in whose favor the provision was made. Section 28-3-306(2), MCA.

¶29 *1. Whether the District Court correctly determined that the Second Lease Amendment is ambiguous.*

¶30 The first issue is whether the Second Lease Amendment unambiguously removed the entirety of Section 5 of the 1992 Lease, as the Tumas contend, or whether it is ambiguous and reasonably susceptible to the interpretation that it removed only the first paragraph of Section 5.

¶31 The 1992 Lease is organized by numbered sections, not numbered paragraphs. Section 5 is titled "Option to Purchase" and contains two paragraphs, each describing a distinct option: (1) an option to purchase the leased premises during the lease term, conditioned on subdivision approval and full payment of the first twenty years of rent; and (2) an option, after the first twenty years and if subdivision remains unavailable, to

11

purchase an undivided tenancy-in-common interest in the smallest tract that can be subdivided with the leased acreage, with exclusive use of that acreage.

¶32     The Second Lease Amendment, however, provides: "Paragraph 5. 'Option to purchase' is hereby removed."  The Amendment does not refer to "Section 5," nor does it expressly state that both paragraphs of Section 5 are removed.  It uses the singular "Paragraph 5," even though Section 5 contains two paragraphs and the Lease itself is structured by sections.

¶33     On its face, this language is susceptible to at least two reasonable but conflicting meanings: (1) it could be read as removing all of Section 5, including both paragraphs, thereby eliminating both the fee-simple purchase option and the tenancy-in-common option; or (2) it could be read as removing only the first paragraph—the paragraph that begins with the heading "Option to Purchase" and describes the fee-simple purchase option—while leaving the second paragraph (the tenancy-in-common option) intact.

¶34     The District Court identified three textual features supporting ambiguity: (1) the Lease is divided into numbered sections, not paragraphs; (2) Section 5 is titled "Option to Purchase" but consists of two paragraphs; and (3) the two paragraphs describe separate options triggered by different conditions and time frames.  The Amendment's reference to "Paragraph 5. 'Option to purchase'" thus does not map cleanly onto the Lease's structure.

¶35     The Tumas argue that the phrase "Paragraph 5. 'Option to purchase' is hereby removed" can only mean that the entire Section 5—both paragraphs—was deleted.  They emphasize that Section 5 is titled "Option to Purchase" and contend that the Amendment's reference to "Paragraph 5" is simply an imprecise way of referring to the entire section.

12

¶36 But the question is not whether the language can be read as the Tumas propose; it plainly can. The question is whether that is the only reasonable reading. *Mary J. Baker Revocable Tr.*, ¶ 20. Given that Section 5 contains two paragraphs, that only the first paragraph begins with the heading "Option to Purchase," and that the Amendment uses the singular "Paragraph 5," it is also reasonable to read the Amendment as targeting only the first paragraph. That reading is reinforced by the fact that more than twenty years had passed by 2018, rendering the first paragraph's timing and consent provisions largely obsolete, while the second paragraph's tenancy-in-common mechanism remained relevant in light of ongoing subdivision restrictions. That reading is also reinforced by the other amendments contained in the Agreement. The Second Lease Amendment amended several provisions of the 1992 Lease. The Amendment also granted the Britts broad rights to "build, construct or excavate on any improved or non improved areas within [the leased tract] without approval from the Trust" and granted them a 30-foot access and utilities license that would convert to a permanent easement upon termination of the lease. Critically, the Second Lease Amendment further stated: "In the event the parent tract is subdivided and to allow conveyance of title to the 6.325 acre tract, Assignees have paid in full for the tract and does [sic] not need to purchase the 6.325-acre tract. Additionally, the license for egress and ingress and utilities will convert to a permanent easement." This language is consistent with the parties' understanding at the time of contracting that the Britts had already paid full consideration for their interest in the leased acreage. The parties later expanded the leasehold to 10.325 acres, but the "paid in full" language remained central to the parties' understanding of the Britts' rights. A contract must be interpreted

13

"to give effect to the mutual intention of the parties as it existed at the time of contracting." Section 28-3-301, MCA.

¶37 We agree with the District Court that the Second Lease Amendment is ambiguous because it is reasonably susceptible to both interpretations. *BMK Enters.*, ¶ 9; *Mary J. Baker Revocable Tr.*, ¶ 20. The ambiguity arises from the mismatch between the Lease's structure (sections with multiple paragraphs) and the Amendment's reference to "Paragraph 5," coupled with the presence of two distinct options within Section 5. Because the Amendment is ambiguous, the District Court properly proceeded to consider extrinsic evidence of the contracting parties' intent. *BMK Enters.*, ¶¶ 16, 18; *K&R P'ship*, ¶ 26; § 28-2-905(2), MCA.

¶38 *2. Whether the District Court correctly considered extrinsic evidence of the contracting parties' intent to conclude that the Britts purchased an undivided tenancy-in-common interest in the Parent Tract.*

¶39 The second issue is whether the District Court correctly considered extrinsic evidence of the contracting parties' intent and, based on that evidence, concluded that the Britts retained a vested right to acquire an undivided tenancy-in-common interest in the Parent Tract under Section 5, paragraph 2.

¶40 Once a contract is found ambiguous, Montana law requires courts to consider extrinsic evidence to ascertain the parties' mutual intent. *BMK Enters.*, ¶ 18; *Mary J. Baker Revocable Tr.*, ¶ 21; § 28-3-402, MCA. The parol evidence rule does not bar such evidence when the issue is the meaning of ambiguous language rather than an attempt to add to or contradict clear terms. *Mary J. Baker Revocable Tr.*, ¶ 21; § 28-2-905(2), MCA.

14

¶41 Here, the District Court considered declarations and deposition testimony from all relevant contracting parties and the drafting attorney: Don and Myrna Hostak (Slater Trust), Adam and Amber Britt (assignees/lessees), and Attorney Brant Beaudry (drafter of the Second and Third Amendments). The Hostaks' Joint Declaration stated unequivocally that the Second Lease Amendment did not remove the second paragraph of Section 5 and that the paragraph enabling the Britts to obtain an undivided tenancy-in-common interest remained in effect. They further explained that the leases were designed to give the tenants rights equivalent to full ownership, with the ability to secure full title ownership, and that this understanding was communicated to the Tumas. Attorney Beaudry corroborated this understanding, stating that the parties directed him to remove the paragraph beginning "Option to Purchase" because more than twenty years had passed and that the intent was to reflect that the Britts had "paid in full" for their property interest. His testimony aligns with the structure of Section 5 and the timing of the Amendment. The Britts' declarations likewise stated that they understood the Second Lease Amendment to preserve their right to acquire a tenancy-in-common interest and that they had paid substantial consideration—both to DeRego and to the Slater Trust—for their interest in the 10.325-acre leasehold. The District Court concluded that this extrinsic evidence was consistent and undisputed as to the contracting parties' intent: the Second Lease Amendment was meant to remove only the first paragraph of Section 5, leaving the tenancy-in-common option in the second paragraph intact, and to memorialize that the Britts had "paid in full" for their interest.

¶42 The Tumas argue that the parol evidence rule barred consideration of the Hostaks' and Beaudry's testimony because, in their view, the Amendment's language is clear and

15

unambiguous. That argument fails at the threshold because, as discussed above, the Amendment is ambiguous. Once ambiguity is found, extrinsic evidence is not only permissible but required to determine the parties' intent. *BMK Enters.*, ¶ 18; *Mary J. Baker Revocable Tr.*, ¶ 21; § 28-2-905(2), MCA.

¶43 The Tumas also contend that the District Court "rewrote" the contract by effectively inserting language limiting the deletion to the first paragraph of Section 5. The court did no such thing. It applied settled principles of contract interpretation—reading the Lease as a whole, recognizing ambiguity, and then using extrinsic evidence to select between competing reasonable interpretations. *Mary J. Baker Revocable Tr.*, ¶¶ 19–21; *BMK Enters.*, ¶¶ 9, 16, 18. The court did not add terms; it determined which of two plausible readings reflected the parties' actual intent.

¶44 Finally, the District Court invoked § 28-3-306(2), MCA, which provides that when a provision is equally susceptible to two constructions, the court must adopt the construction most favorable to the party in whose favor the provision was made. Section 5's tenancy-in-common option was plainly drafted for the benefit of the lessee— first DeRego, then the Britts. Where any residual doubt remained after considering the extrinsic evidence, the statute required the court to construe the ambiguity in favor of the Britts.

¶45 On this record, the District Court correctly concluded that: (1) the Second Lease Amendment did not remove the second paragraph of Section 5; (2) the Britts retained a vested right to acquire an undivided tenancy-in-common interest in the Parent Tract, with exclusive use of the 10.325-acre leasehold; and (3) they had "paid in full" for that interest.

16

¶46   *3. Whether the District Court properly evaluated Don Hostak's testimony in concluding that the Britts retained the ability to acquire the tenancy-in-common interest.*

¶47   The third issue is whether the District Court erred in concluding that Don Hostak's deposition testimony did not create a genuine issue of material fact regarding the parties' intent. The Tumas argue that Don's deposition "fundamentally contradicted" the Joint Declaration and that the District Court improperly credited the declaration over the deposition, thereby weighing credibility at the summary judgment stage.

¶48   The District Court acknowledged that Don's memory had declined between November 2024, when he signed the Joint Declaration, and April 2025, when he was deposed. It nonetheless concluded that his deposition did not "fundamentally contradict" the declaration's core statements about the intent underlying the Second Lease Amendment.

¶49   In his deposition, Don testified that he did not recall why the "Option to Purchase" was removed, did not know what a "tenancy in common" was, and could not remember whether any part of the option remained. He also testified, however, that he believed the Britts should have the right to acquire title if subdivision became possible in the future. When shown the Joint Declaration, he acknowledged his signature and agreed that he would have understood and agreed with its contents at the time he signed it. Myrna Hostak testified she was as involved in the Trust as Don, their intent was to preserve the Britts' right to acquire title regardless of subdivision, the Britts retained their tenancy-in-common option, and the Joint Declaration accurately reflected both her and Don's understanding when they signed it.

¶50 A witness's later inability to recall details or define legal terms does not, by itself, create a genuine factual dispute with earlier, clear, and corroborated statements of intent. *See Becker v. Rosebud Operating Servs.*, 2008 MT 285, ¶ 30, 345 Mont. 368, 191 P.3d 435 (summary judgment not defeated by speculative or conclusory assertions); *Stott v. Fox*, 246 Mont. 301, 305, 805 P.2d 1305, 1308 (1990) (non-moving party must present material and substantial evidence, not mere conjecture).

¶51 The District Court did not weigh competing versions of events or choose between conflicting factual narratives. Rather, it found that Don's deposition did not contradict the declaration's central point—that the parties intended to preserve the tenancy-in-common option—and that any gaps in his memory were explained by his age and acknowledged decline. That conclusion is supported by the record and by Myrna's corroborating testimony.

¶52 Moreover, even if Don's deposition could be read to suggest some uncertainty about his intent in 2018, the extrinsic evidence as a whole—including Myrna's testimony and Beaudry's declaration—remains consistent and undisputed. The Tumas offered no contrary testimony from any contracting party or drafter. Their disagreement rests on their own interpretation of the documents, not on competing evidence of the original parties' intent. That is insufficient to create a genuine issue of material fact. *BMK Enters.*, ¶ 7.

¶53 The District Court therefore did not err in concluding that Don's deposition did not create a triable factual dispute and that summary judgment remained appropriate. Don Hostak's later memory lapses did not fundamentally contradict the Joint Declaration or create a genuine issue of material fact. The District Court correctly applied Montana's

18

contract interpretation framework, including § 28-3-306(2), MCA, in construing any remaining ambiguity in favor of the party for whose benefit the tenancy-in-common provision was made—the lessee.

## CONCLUSION

¶54 The District Court's partial grant of summary judgment in favor of the Britts is affirmed.

/S/ INGRID GUSTAFSON

We Concur:

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JIM RICE